NATURAL GAS PIPELINE COMPANY OF AMERICA, APPELLANT, V. STATE BOARD OF EQUALIZATION AND ASSESSMENT, APPELLEE. TRAILBLAZER PIPELINE COMPANY, APPELLANT, V. STATE BOARD OF EQUALIZATION AND ASSESSMENT, APPELLEE.

466 N.W.2d 461

Filed March 1, 1991.   Nos. 89-901, 89-902.

William R. Johnson, of Kennedy, Holland, DeLacy & Svoboda, and Bruce J. McWhirter, of Ross & Hardies, for appellants.

Robert M. Spire, Attorney General, and L. Jay Bartel for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

This is an appeal from the findings and order of the State

Board of Equalization and Assessment (Board) dated August 15, 1989, denying claims for property tax relief submitted by various centrally assessed and locally assessed claimants. Pursuant to this court's order of September 11, 1989, the parties filed a "case stated" in accordance with Neb. Ct. R. of Prac. 5L (rev. 1989), separately setting forth the rulings of the Board complained of by the appellants and the exceptions and contentions of the parties with respect to those issues. In view of a community of issues and counsel, we have consolidated the appeals of Natural Gas Pipeline Company of America (NGPL) (case No. 89-901) and Trailblazer Pipeline Company (Trailblazer) (case No. 89-902) for disposition.

## I. BACKGROUND

NGPL and Trailblazer are the owners of centrally assessed property in the State of Nebraska and operate natural gas transmission pipelines in Nebraska. The appellants' property in Nebraska includes real estate and personal property.

After our opinion in *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989), *cert. denied* 493 U.S. 1078, 110 S. Ct. 1130, 107 L. Ed. 2d 1036 (1990), was filed on July 14, 1989, NGPL and Trailblazer sought equalization by the Board of the value of their property for Nebraska taxation. See Neb. Rev. Stat. § 77-506 (Reissue 1990).

### A. 1988 Tax Year

In *Northern Natural Gas Co.*, this court considered the effect of *Trailer Train Co. v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), which construed § 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. 94-210, 90 Stat. 31, 54, codified as amended at 49 U.S.C. § 11503(b)(4) (1988) (the 4-R Act). Section 306(1)(d) prohibits the states from imposing a tax on transportation property when the tax "results in discriminatory treatment of a common carrier by railroad . . . ."

In reviewing the 4-R Act, the U.S. Court of Appeals noted that the act prohibits imposition of a tax which discriminates against railroads, and considered personal property tax exemptions in determining whether there was discriminatory

tax treatment of railroads by the Nebraska tax structure. The court concluded: "When the exemptions apply to three-fourths of the commercial and industrial property in Nebraska, and do not apply to rail cars, the tax system in Nebraska discriminates against Trailer Train and violates § 306(1)(d) of the 4-R Act." 885 F.2d at 418. The federal court then affirmed the injunction, granted by the trial court, which prevented the State of Nebraska from "collection of the discriminating tax." *Id.*

In *Northern Natural Gas Co., supra,* considering the effect of the *Trailer Train Co.* decision, we concluded that disproportionality in taxation within a class of property required this court to

> correct [a] constitutional inequity by lowering the complaining taxpayer's valuation to such an extent so as to equalize it with other property in the state. [Citations omitted.] This being the case, no logical reason exists why the same requirement of valuation reduction should not be imposed when the disproportionality is brought about by a final judgment of the federal court exempting the personal property of the railroads and car companies from the imposition of a state tax.

232 Neb. at 815, 443 N.W.2d at 256.

In *Northern Natural Gas Co.,* we also considered whether a gas transmission pipeline was a fixture and, therefore, real estate taxable pursuant to Neb. Rev. Stat. § 77-103 (Reissue 1986). To resolve that issue, we employed a three-part common-law test to determine whether an item was a fixture: "(1) actual annexation to the realty, or something appurtenant thereto, (2) appropriation to the use or purpose of that part of the realty with which it is connected, and (3) the intention of the party making the annexation to make the article a permanent accession to the freehold." 232 Neb. at 817, 443 N.W.2d at 257. Applying the foregoing test, we concluded that a natural gas transmission line was not a fixture, since "the pipeline is not adapted to the use to which the ground in which it is embedded is applied," 232 Neb. at 821, 443 N.W.2d at 259, and concluded that the taxpayer's intention "was not to convert its annexations into fixtures. Consequently, we find the pipelines to be personal property," 232 Neb. at 822, 443 N.W.2d at 259.

Therefore, this court reversed the decision of the Board, which had refused Northern Natural Gas Company and Enron Liquids Pipeline Company's request that their property be equalized with property of railroads and car companies operating in Nebraska, and remanded the matter to the Board for further proceedings.

In the companion cases of *Trailblazer Pipeline Co. v. State Bd. of Equal.*, 232 Neb. 823, 442 N.W.2d 386 (1989), also decided July 14, 1989, this court held the rights of Trailblazer and NGPL regarding their equalization requests in 1988 were determined by *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989), and remanded those causes to the Board for further proceedings.

## B. 1989 TAX YEAR

In the proceedings after remand of the appellants' causes, the Board received evidence on August 11, 1989, pursuant to a stipulation among the parties, regarding the appellants' requests for equalization. Much of the stipulated evidence was the same as that presented in the 1988 hearing which was the basis for Trailblazer's and NGPL's previous appeals reported in *Trailblazer Pipeline Co., supra.* The parties have stipulated that NGPL's property in Nebraska was valued at $19,147,520 and that Trailblazer's property was valued at $95,070,376. Approximately 92 percent of NGPL's property in Nebraska is personal property and approximately 99 percent of Trailblazer's property in Nebraska is personal property.

At the equalization hearing on August 11, the Board set the equalization rate at 91.91 percent of actual value and, in its order of August 15, 1989, construed the appellants' requests for equalization as applications for tax exemption, stating:

Equalization is the process by which the State Board assures that all tangible property and franchises, which are subject to tax, are assessed at a uniform level of value. The State Board does not have the authority to consider a claim for equalization of one class or subclass of property to a level of another class or subclass of property that is exempt or is not subject to tax, as this is a claim for exemption. While a claim as to the propriety of an

exemption may have merit, it is not properly raised before the State Board, and the claimants should seek other avenues of redress.

The claims brought before the State Board . . . are . . . claims to have the valuation of a subclass of personal property, commonly known as business personal property, equalized to the level of value of the personal property of car companies and railroad companies. . . .

The State Board finds that the state of Nebraska is preempted from taxing the personal property of car companies and railroad companies pursuant to a federal adjudication of section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act, commonly referred to as the 4-R Act. 49 U.S.C. section 11503(b)(4). As a result of such federal preemption, the State Board finds that the personal property of car companies and railroad companies is not subject to tax and, therefore, cannot be the basis for a claim of equalization.

The State Board finds that in reality the claims of these centrally assessed claimants and locally assessed claimants are claims requesting to have their business personal property and/or real property exempt from taxation. The State Board finds that it has no statutorial [sic] or constitutional authority to rule upon such a claim.

## II. ISSUES ON APPEAL

After the Board denied the claimants' equalization requests, NGPL and Trailblazer appealed, contending that the equalization rate of 91.91 percent violated Neb. Const. art. VIII, § 1, concerning uniform and proportionate values for taxation, and violated the equal protection clause of U.S. Const. amend. XIV. The appellants also contend that the Board erred by not granting the requested equalization in conformity with the uniformity and proportionality provision of the Nebraska Constitution and that the Board erred in its conclusion that it lacked authority to act on the appellants' requests for equalization.

Without responding to the appellants' assignments of error, the State filed its briefs and referred to events which occurred

after the Board's decision of August 15, 1989, and which occurred after the appellants filed their briefs in this appeal, namely, L.B. 1 and L.B. 7, which were passed on November 17, 1989, during a special session of the Nebraska Legislature and which, with an emergency clause, were signed by the Governor on November 21, 1989. In its briefs, the State contends that L.B. 1 and L.B. 7 render these appeals moot.

## A. L.B. 1 AND L.B. 7

L.B. 1 provides in part:

Section 1. That section 77-103, Reissue Revised Statutes of Nebraska, 1943, be amended to read as follows:

77-103. The terms real property, real estate, and lands shall ~~include~~ mean city and village lots and all other lands, and all buildings, fixtures, improvements, cabin trailers or mobile homes which shall have been permanently attached to the real estate upon which they are situated, mines, minerals, quarries, mineral springs and wells, oil and gas wells, overriding royalty interests and production payments with respect to oil or gas leases, units of beneficial interest in trusts, the corpus of which includes any of the foregoing, and privileges pertaining thereto, and pipelines, railroad track structures, electrical and telecommunication poles, towers, lines, and all items actually annexed to such property, and any interest pertaining to the real property or real estate.

The sole test for determining whether an item is a fixture or an improvement shall be whether there is actual annexation to the real property or real estate or something appurtenant thereto. Unless specifically enumerated in this section, real property and real estate shall not include machinery and equipment used for business purposes or center pivot or other irrigation systems of a type used for agricultural or horticultural purposes.

Sec. 2. The changes made to section 77-103 by this legislative bill are expressly intended to apply to all litigation concerning ad valorem property taxes for the 1989 calendar year, including all litigation pending on the effective date of this act. [Sections 1 and 2 underscoring indicates amendatory new language.]

Sec. 3. This act shall become operative on January 1, 1989.

Sec. 4. If any section in this act or any part of any section shall be declared invalid or unconstitutional, such declaration shall not affect the validity or constitutionality of the remaining portions thereof. [Sections 3 and 4 are amendatory new language.]

The State concedes that the Legislature cannot, by definition, create a class of exempt personal property under the authority granted under Neb. Const. art. VIII, § 2, by defining property which clearly constitutes real property to be personal property.

L.B. 7, § 1, which is entirely new legislation, provides:

(1) The Legislature finds and declares that the levy and collection of property taxes upon the personal property of car line companies, which is composed of railroad rolling stock, has been enjoined by federal court order as a discriminatory tax in violation of section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act, 49 U.S.C. 11503(b)(4).

(2) The Legislature finds and declares that, as a result of such court action, the Nebraska Supreme Court has ordered that the personal property of certain other taxpayers must be treated the same as that of such car line companies, which is in the same class for taxation purposes, but not taxed by virtue of federal court order, thereby diminishing to a potentially substantial degree the property tax base of local governmental subdivisions and consequently jeopardizing the continued adequate funding of essential public services provided by those subdivisions.

(3) The Legislature further finds and declares that some types of agricultural and manufacturing products and natural resources must or can more efficiently be transported over rails due to size, weight, and other restrictions or conditions and the transportation of such products is vital to the commerce and industry of the state and that therefor it is in the best interests of the state to enact legislation to encourage the maintenance in and

through the state of railroad rolling stock which is the means of transporting such products.

(4) Therefor, the Legislature finds and declares that a rational basis exists to classify railroad rolling stock as a separate and distinct class of property and to exempt the class from property taxation pursuant to the authority granted under Article VIII, section 2, of the Constitution of Nebraska.

(5) It is the express intention of the Legislature that the changes made by this legislative bill shall affect all state litigation pending as of the effective date of this act.

This language has been codified at Neb. Rev. Stat. § 77-202.47 (Reissue 1990).

L.B. 7, § 2, amended Neb. Rev. Stat. § 77-202 (Cum. Supp. 1988) regarding personal property which is exempt from taxation. In its first 10 subsections, L.B. 7, § 2, reiterated the same exemptions which existed under § 77-202 (Cum. Supp. 1988), amended by L.B. 7, while subsection (11) (§ 77-202(11) (Reissue 1990)) provided for a new exemption of personal property as follows:

(11) Railroad rolling stock shall be exempt from the personal property tax. Railroad rolling stock shall mean locomotives, freight cars, and other flanged-wheel equipment operated solely on rails and owned, leased, or used for or in railroad transportation. For tax year 1989, this subsection shall apply to railroad rolling stock upon which no levy has been made or upon which no tax may lawfully be collected.

L.B. 7, § 9, states: "This act shall become operative on January 1, 1989." L.B. 7, § 10, recites: "If any section in this act or any part of any section shall be declared invalid or unconstitutional, such declaration shall not affect the validity or constitutionality of the remaining portions thereof."

The State contends that L.B. 1 and L.B. 7 render these appeals "moot," and argues:

[T]he enactment of LB 7 effectively eliminates and moots any claim of a lack of "equalization" of appellant's personal property with the personal property of railroads and car companies for tax year 1989 as, by virtue of the

Legislature's establishment of a separate class of exempt personal property consisting of railroad rolling stock under the authority granted pursuant to Article VIII, Section 2, of the Nebraska Constitution, appellant's claim improperly seeks equal treatment with property which is separately classified and exempted from taxation under state law, and not "other taxable property in the same class." . . . In short, LB 7 removes any basis for appellant to assert a lack of "equalization" with regard to the taxation of its personal property under Nebraska law in relation to the personal property of railroads and car companies operating in Nebraska for 1989, as found in the Court's prior decision in [*Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989)].

Briefs for appellee at 13-14.

Regarding L.B. 1, the State presents an argument much in the same vein as its argument for retroactivity of L.B. 7, that is, the statutory definition of "real estate," contained in L.B. 1 as an amendment to § 77-103 (Reissue 1986), renders these appeals "moot."

The State's reliance on events subsequent to the Board's action in August 1989 has presented an unusual procedural aspect to these appeals. Responding to the State's position of mootness, the appellants' reply brief contains several propositions on the mootness issue raised for the first time in the State's briefs. In our reading of the appellants' reply brief, we construe the various legal propositions stated by the appellants to be assignments of error which would have been asserted in their initial briefs if L.B. 1 and L.B. 7 had been in existence and, therefore, relied upon by the Board in its action taken in August 1989.

### B. APPLICATION OF L.B. 1 TO 1989 TAX YEAR

The State's arguments concerning L.B. 1 and L.B. 7 presuppose that the two pieces of legislation could be properly applied in the 1989 tax year. We reach the opposite conclusion (1) because the subject matter of L.B. 1 is irrelevant to the matter of equalization and (2) because the application of L.B. 1

for the 1989 tax year would result in the commutation of a tax, in violation of Neb. Const. art. VIII, § 4.

As noted above, L.B. 1 changes the definition of "fixture," apparently to avoid the characterization of certain pipeline property as personal property rather than real estate. The practical effect of L.B. 1, therefore, would be to increase the proportion of pipeline property taxable as real estate. See, e.g., *Northern Natural Gas Co., supra.* In this action, the appellants requested "equalization." For purposes of equalization, however, it is immaterial whether the appellants' property is categorized as personal property or real estate.

Neb. Const. art. VIII, § 1, provides that, except for motor vehicles, "[t]axes shall be levied by valuation uniformly and proportionately upon all tangible property . . . ." The purpose of equalization of assessments is to bring the assessment of different parts of a taxing district to the same relative standard, so that no one of the parts may be compelled to pay a disproportionate part of the tax. *Gordman Properties Co. v. Board of Equal.*, 225 Neb. 169, 403 N.W.2d 366 (1987); *Hacker v. Howe*, 72 Neb. 385, 101 N.W. 255 (1904). Accordingly, Neb. Rev. Stat. § 77-201 (Reissue 1990) provides that "all tangible property and real property in this state, not expressly exempt therefrom, shall be subject to taxation and shall be valued at its actual value. Such actual value shall be taken and considered as the taxable value on which the levy shall be made." The State agrees that "both real property and taxable personal property are within the class of 'all tangible property' under Article VIII, Section 1, of the Nebraska Constitution." Briefs for appellee at 47.

Since these causes must be remanded to the Board for further proceedings, we further observe that L.B. 1 cannot be constitutionally applied for the 1989 tax year because such application would result in the commutation of a tax, in violation of Neb. Const. art. VIII, § 4, which provides:

> Except as to tax and assessment charges against real property remaining delinquent and unpaid for a period of fifteen years or longer, the Legislature shall have no power to release or discharge any county, city, township, town, or district whatever, or the inhabitants thereof, or any

corporation, or the property therein, from their or its proportionate share of taxes to be levied for state purposes, or due any municipal corporation, nor shall commutation for such taxes be authorized in any form whatever; *Provided*, that the Legislature may provide by law for the payment or cancellation of taxes or assessments against real estate remaining unpaid against real estate owned or acquired by the state or its governmental subdivisions.

The power to tax is exercised when the tax is levied. See *Am. Prov. of Servants of Mary Real Estate Corp. v. County of Douglas*, 147 Neb. 485, 23 N.W.2d 714 (1946). In the present case, the entire process for levying taxes on valuations established in 1989 had been fully completed by the time L.B. 1 was enacted.

Pursuant to Neb. Rev. Stat. § 77-509 (Reissue 1990), the Board must certify its order pertaining to valuation and equalization to county officials on or before August 15. The county boards must then levy taxes for all political subdivisions by September 15. Neb. Rev. Stat. § 77-1601 (Reissue 1990). Section 77-1601 contains a special provision for further extension of budgets and levies, but such must be completed prior to November 1.

The county officer responsible for preparing the tax list must extend the levies and prepare the tax list for all property prior to November 1. See Neb. Rev. Stat. § 77-1613 (Reissue 1990). Such tax lists must, for personal property, be delivered to the county treasurer on or before November 1. See Neb. Rev. Stat. § 77-1616 (Reissue 1990). Those personal property taxes are due and become a lien on November 1. See Neb. Rev. Stat. § 77-205 (Reissue 1990).

The tax year is, therefore, completed on November 1, and the collection process cannot be changed without violating the provisions of Neb. Const. art. III, § 18, and Neb. Const. art. VIII, § 4. See, *Steinacher v. Swanson*, 131 Neb. 439, 268 N.W. 317 (1936); *Lynch v. Howell*, 165 Neb. 525, 86 N.W.2d 364 (1957) ("[t]he power to tax is determinable as of the date the tax is levied" (syllabus of the court)).

In *Steinacher v. Swanson, supra*, this court determined that

an act which provided that, under certain conditions, delinquent personal taxes could be paid in five equal annual installments and delinquent realty taxes could be paid in ten annual installments was a violation of Neb. Const. art. VIII, § 4, and the prohibition against a commutation for taxes "in any form whatever." In *Steinacher*, the court referred to a definition of "commutation" expressed in *Woodrough v. Douglas County*, 71 Neb. 354, 361, 98 N.W. 1092, 1095 (1904):

> [C]ommutation is a passing from one state to another; an alteration, a change; the act of substituting one thing for another; a substitution of one sort of payment for another, or of a money payment in lieu of a performance of a compulsory duty or labor or of a single payment in lieu of a number of successive payments, usually at a reduced rate.

*Steinacher* provides an insight into the types of statutes which are prohibited by Neb. Const. art. VIII, § 4:

> It is quite apparent that the framers of the Constitution of 1875, the one first containing this provision, and the members of all subsequent constitutional conventions, have been imbued with the idea that all taxpayers are entitled to the same treatment by the government they support. For this reason they have expressly written into our Constitution that the legislature not only shall have no power to release or discharge any one from the payment of his share of taxes, but a commutation for taxes *in any form whatever* is prohibited. From an examination of the definitions of the word "commutation" hereinbefore set out, and the use of the words "in any form whatever," contained in our constitutional provision, it is quite apparent that the legislature is prohibited by the Constitution from changing the method of payment of any tax once levied. Clearly, under this constitutional provision, the legislature cannot reduce the amount of the tax, extend the time of payment, or in any manner change the method of payment.

(Emphasis in original.) *Steinacher, supra* at 446, 268 N.W. at 321.

The real and personal property involved in these cases is

centrally assessed. As we noted above, the effect of L.B. 1, if applied retroactively to the 1989 tax year, would be to go back in time, increase the proportion of appellants' property that would presumably be taxable as real estate under our decision in *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989), and significantly decrease the proportion of the appellants' personal property. However, the 1989 levy on both real and personal property was completed, and the taxing power exercised, 20 days before L.B. 1 was enacted.

Although the total amount of property subject to levy would remain the same, the effect of applying L.B. 1 in the 1989 tax year would involve the substitution of one sort of payment for another—the payment of a tax on real estate for a tax on personal property. This substitution, in effect, amounts to a commutation of the tax levied on the appellants' personal property and is prohibited by Neb. Const. art. VIII, § 4.

### C. Application of L.B. 7 to 1989 Tax Year

As stated above, L.B. 7, § 2, amending § 77-202 at new subsection (11), exempts railroad rolling stock from taxation. The bill contains a specific legislative finding that

> the levy and collection of property taxes upon the personal property of car line companies, which is composed of railroad rolling stock, has been enjoined by federal court order as a discriminatory tax in violation of section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act, 49 U.S.C. § 11503(b)(4).

Accordingly, the Legislature specifically found and declared that "a rational basis exists to classify railroad rolling stock as a separate and distinct class of property and to exempt the class from property taxation . . . ."

The appellants argue that the exemption of railroad rolling stock is a discriminatory classification which is unjustified and arbitrary.

We first note that the Legislature's declaration that taxation of railroad rolling stock was found to be a discriminatory tax in violation of federal law is incomplete. In *Trailer Train Co. v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), the court held only

that exemptions in Nebraska's personal property tax system favored the property of a majority of possible taxpayers in Nebraska and denied similar favorable treatment to the property of rail carlines; hence, Nebraska's personal property tax system imposed an unfair and discriminatory tax on railroads, in violation of the 4-R Act. Therefore, taxation of railroad property does not, in and of itself, violate federal law, as the Legislature seems to suggest. As noted in *Trailer Train Co.*, when property of a majority of possible taxpayers is exempted from taxation and railroad property is not exempt, there is discrimination against railroads which results in a violation of the 4-R Act.

In subsection (3) of L.B. 7, § 1, the Legislature attempts to justify the tax exemption of railroad rolling stock through the statement that

> some types of agricultural and manufacturing products and natural resources must or can more efficiently be transported over rails due to size, weight, and other restrictions or conditions and the transportation of such products is vital to the commerce and industry of the state and that therefor it is in the best interests of the state to enact legislation to encourage the maintenance in and through the state of railroad rolling stock . . . .

In *State, ex rel. Cone v. Bauman*, 120 Neb. 77, 82-83, 231 N.W. 693, 695 (1930), this court stated:

> The rule is well established that the legislature may, for the purpose of legislating, classify persons, places, objects or subjects, but such classification must rest upon some difference in situation or circumstance which, in reason, calls for distinctive legislation for the class. The class must have a substantial quality or attribute which requires legislation appropriate or necessary for those in the class which would be inappropriate or unnecessary for those without the class.

"A legislative classification must operate uniformly on all within a class which is reasonable. Exemptions are allowed where they are made applicable to all persons of the same class similarly situated." *Casey's Gen. Stores v. Nebraska Liq. Cont. Comm.*, 220 Neb. 242, 243, 369 N.W.2d 85, 87 (1985). See,

also, *State ex rel. Meyer v. Knutson*, 178 Neb. 375, 133 N.W.2d 577 (1965).

The Legislature's exemption of railroad rolling stock is not based on any real distinction between railroads and other common carriers. If "size" and "weight," mentioned in the Legislature's stated justification for the classification, refer to things which are large and heavy and the "restrictions or conditions" means that speed is not required, then the expressed legislative justification could just as easily refer to trucks and trucking companies as to railroads. On the other hand, if one thinks in terms of things which are small and light and must be moved quickly, the expressed justification could just as easily refer to airlines and airline companies.

The Legislature's stated justification is illusory. We fail to see any real and substantial difference between personal property used for income production by one type of business and the same type of income-producing personal property used by another type of business.

The Legislature's effort to exempt railroads is not based on a reasonable classification and violates both the proportionality and special legislation requirements of the Nebraska Constitution. There is no reasonable basis for treating railroads differently from other common carriers; therefore, the distinction, as a classification and basis for an exemption from personal property tax, reflected in L.B. 7, results from special legislation, prohibited by Neb. Const. art. III, § 18, and violates the uniformity clause of Neb. Const. art. VIII, § 1.

### III. INITIAL ASSIGNMENTS OF ERROR

Having determined that L.B. 1 cannot constitutionally be applied to the 1989 tax year and that L.B. 7 is invalid as special legislation and in violation of the uniformity clause, we now address the assignments of error raised in the appellants' initial briefs.

#### A. AUTHORITY OF THE BOARD

First, there is the question concerning the Board's authority to act on the appellants' requests for equalization. The Board found that "the state of Nebraska is preempted from taxing personal property of car companies and railroad companies

pursuant to federal adjudication" of the 4-R Act. The Board then concluded that "the personal property of car companies and railroad companies is not subject to tax and, therefore, cannot be the basis for [the appellants'] claim of equalization."

The Board's conclusion as to "preemption" is clearly erroneous. As we read *Trailer Train Co. v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), and the 4-R Act, the State of Nebraska is prohibited by federal law from discriminatorily taxing railroad companies. In other words, federal law prohibits Nebraska from "[t]he imposition of any . . . tax which results in discriminatory treatment of a common carrier by railroad . . . ." § 306(1)(d) of the 4-R Act.

For that reason, in *Trailer Train Co.*, the State of Nebraska was enjoined from "collection of the discriminating tax," 885 F.2d at 418, but is not prohibited from levying a lawful tax on a common carrier by railroad. In many respects, the effect of the 4-R Act is very similar to and substantially no different from the effect to be achieved through the uniformity and proportionality clause in Neb. Const. art. VIII, § 1.

Therefore, whereas the Board concluded that it could not consider the appellants' requests for equalization in view of the 4-R Act and interpretational decisions by federal courts, we conclude that § 306(1)(d) of the 4-R Act, as interpreted by the federal courts, prohibits a discriminatory tax against a railroad but does not prevent a state's nondiscriminatory taxation of a railroad. A nondiscriminatory tax is what is required by the 4-R Act, not the abolition of legitimate state taxation of railroads.

## B. APPELLANTS' REQUESTS FOR EQUALIZATION

Second, the Board construed the appellants' requests as a claim for exemption from taxation. We do not deny that the actual extent of the actual taxation of the appellants' property may be greatly affected by the impact of the 4-R Act and federal court decisions such as *Trailer Train Co.* However, to describe the appellants' requests for equalization as requests for exemption from taxation is unrealistic and arbitrary. The fact remains that the appellants requested equalization of their property, which must be considered in the light of applicable law, state and federal, statutory, and declared by judicial

interpretation of controlling statutes.

The basic principles pertaining to equalization of assessments are found in *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 302, 344 N.W.2d 620, 625 (1984):

> [I]t is permissible to reasonably classify property for tax purposes and to use different methods to determine assessed values for different classifications of property. To comport with our Constitution's requirement that "[t]axes shall be levied by valuation uniformly and proportionately upon all tangible property," however, the results obtained by such permissible different methods must be in some way correlated so that the results reached shall be uniform and proportionate and shall not exceed actual value.

Furthermore,

> if the Board arbitrarily undervalues a particular class of property so as to make another class of property disproportionately higher, or achieves the same result because of legislative action, this court must correct that constitutional inequity by lowering the complaining taxpayer's valuation to such an extent so as to equalize it with other property in the state.

*Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 815, 443 N.W.2d 249, 256 (1989).

We therefore remand these causes to the Board for further proceedings consistent with this opinion and other applicable law, which includes *Northern Natural Gas Co. v. State Bd. of Equal., supra,* and *Trailblazer Pipeline Co. v. State Bd. of Equal.,* 232 Neb. 823, 442 N.W.2d 386 (1989).

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WHITE and FAHRNBRUCH, JJ., concurring.

While we concur in the result of the court's judgment, we wish to point out that the entire property tax base for school districts and other local units of government may be at risk.

The controlling federal law in *Trailer Train Co. v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), was § 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976, which prohibits any state from imposing "any other tax

which results in discriminatory treatment of a common carrier by railroad . . . ." The court, in discussing the Nebraska statutory pattern of exemptions, simply held that "[w]hen the exemptions apply to three-fourths of the commercial and industrial property in Nebraska, and do not apply to rail cars, the tax system in Nebraska discriminates against Trailer Train and violates . . . the 4-R Act." 885 F.2d at 418. There are similar federal statutes affecting interstate commerce in regard to air carriers, 49 U.S.C. § 1513 (1988); motor carriers, 49 U.S.C. § 11503a (1988); national banks, 12 U.S.C. § 548 (1988); federal savings and loan associations, 12 U.S.C. § 1464(h) (1988); and federal credit unions, 12 U.S.C. § 1768 (1988).

This state's response to *Leuenberger, supra*, was to enact L.B. 7, providing an additional exemption, this time for railroad rolling stock, thereby creating even greater discriminatory treatment against that commercial and industrial property which is not exempted.

It becomes obvious, therefore, that railroad rolling stock cannot be taxed at anything approaching the commanded "actual value," Neb. Rev. Stat. § 77-201 (Reissue 1990), absent legislative repeal of the exemptions set out in Neb. Rev. Stat. § 77-202 (Reissue 1990), or at least those of which it cannot be said that a justifiable and reasonable classification exists for the exemption. On the face of the statute, those exemptions that appear justifiable relate to exemptions of property whose tax proceeds would not justify the costs of collection, e.g., household goods, and to exemptions of property owned by nonprofit religious, educational, charitable, horticultural, or cemetery organizations, which property is used for those purposes.

If the system of ad valorem taxation is worthy of surviving as a method of supporting local units of government, then under our constitutional system, all property, except household goods and property owned by nonprofit educational, charitable, horticultural, or cemetery organizations, which property is used for those purposes, must be taxed or no property may be taxed.

This court in *Stahmer v. State*, 192 Neb. 63, 218 N.W.2d 893 (1974), wrongfully justified the partial exemption from

taxation of an entire class of personal property, agricultural machinery, holding that the power to exempt personal property from taxation granted by the 1970 amendment to Neb. Const. art. VIII, § 2, to wit: " 'The Legislature *may classify personal property in such manner as it sees fit, and may exempt any of such classes, or may exempt all personal property from taxation*' " (emphasis in original), 192 Neb. at 67, 218 N.W.2d at 896, prevails over the uniformity requirement of Neb. Const. art. VIII, § 1, and is subject only (if at all) to the reasonableness of the classification of exempt property.

It has been said that "[t]axes are what we pay for civilized society," *Compania de Tabacos v. Collector*, 275 U.S. 87, 100, 48 S. Ct. 100, 72 L. Ed. 177 (1927) (Holmes, J., dissenting), and that "governmental costs not shared by one group of taxpayers must necessarily be shifted to and be borne by the remaining taxpayers . . . ." *Equitable Life v. Lincoln Cty. Bd. of Equal.*, 229 Neb. 60, 62, 425 N.W.2d 320, 322 (1988). When property, regardless of whether it is real or tangible personal property, is classified so that it provides exemption from taxation to all but a small amount of property, the classification and exemption may well be unreasonable and arbitrary and may fall within the prohibition of Neb. Const. art. III, § 18, which is this state's "equal protection clause."

But, even if this state's present classification of property as exempt and not exempt was to be found valid under Nebraska's Constitution, it could not withstand muster under federal law. See *Leuenberger, supra*. See, also, *Trailer Train Co. v. State Bd. of Equalization*, 511 F. Supp. 553 (N.D. Cal. 1981) (stating that § 306 of the 4-R Act preempts discriminatory state tax law), *modified* 697 F.2d 860 (9th Cir. 1983), *cert. denied* 464 U.S. 846, 104 S. Ct. 149, 78 L. Ed. 2d 139; *State of Tenn. v. Louisville & N. R. Co.*, 478 F. Supp. 199 (M.D. Tenn. 1979) (upholding supremacy of federal law), *aff'd* 652 F.2d 59 (6th Cir. 1981), *cert. denied* 454 U.S. 834, 102 S. Ct. 135, 70 L. Ed. 2d 114.

The principles in *Trailer Train Co. v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), in regard to discriminatory treatment of property, if followed to their logical conclusion, might well be applied not only to personal property, but also to real estate.

U.S. Const. art. VI provides in relevant part:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

In *Leuenberger, supra*, the U.S. Court of Appeals applied the provision of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. 94-210, 90 Stat. 31, 54, § 306(1)(d). The court condemned as discriminatory Nebraska's constitutional and statutory scheme of taxation of 25 percent of personal property and exemption of the remaining 75 percent. The personal property tax simply could not be enforced against railroad rolling stock while the exemptions exist. It is more than mere speculation that the court of appeals might well rule similarly in regard to other taxpayers who are also protected from tax discrimination by federal legislation.

In view of the numerous exemptions currently granted by Nebraska, the supremacy clause makes it impossible to levy taxes "by valuation uniformly and proportionately" on most real and tangible property, as commanded by Neb. *Const.* art. VIII, § 1. The 4-R Act and its companions in the supreme federal law prohibit taxation without taking into account exempt property, thus reducing the valuation of the protected properties to at least something less than true value, if logically any value at all.

At the same time, the boards of equalization cannot exercise their duty of valuing uniformly if the federally protected property and exempt property are not taxed and nonprotected and nonexempt property is valued and taxed.

The decision in *Leuenberger, supra*, has sounded the death knell for personal property taxation in this state unless the preferential treatment to certain classes of personal property is abandoned. Taxation of real estate may also be at risk for the same reasons.

GRANT, J., concurring.
I join in the concurring opinion of Judges White and

Fahrnbruch. I write to discuss another point which I feel should also be determined by the court at this time in connection with L.B. 1.

As noted in the opinion of the court, L.B. 1 departs from the common-law definition of "fixture" in order to avoid the characterization of certain property as personal property rather than real estate, thus increasing the proportion of pipeline property taxable as real estate under *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989). We have concluded that L.B. 1 cannot constitutionally be applied to the 1989 tax year. I fully agree with that decision, but I also believe that L.B. 1 is unconstitutional on its face, and we should make that determination at this time.

Although the Legislature has broad power to define property for tax purposes, its power to define is limited, since (1) the Legislature cannot abrogate or contradict an express constitutional definition and (2) the legislative definition must be reasonable and cannot be arbitrary or unfounded. See, *State ex rel. Meyer v. Peters*, 191 Neb. 330, 215 N.W.2d 520 (1974); *Moeller, McPherrin & Judd v. Smith*, 127 Neb. 424, 255 N.W. 551 (1934).

The Legislature's power of definition may not be employed to nullify or circumvent the provisions of the Nebraska Constitution. In *State ex rel. Meyer v. Peters, supra*, we considered legislation purporting to exempt "household goods" from taxation, pursuant to Neb. Const. art. VIII, § 2, which provided, "Household goods and personal effects, as defined by law, may be exempted from taxation in whole or in part . . . ." The definition of "household goods" in the taxing statute at issue in *Peters*, however, included "major appliances either attached or detached to real property." In other words, the statute purported to exempt property which would, under the common law of fixtures, be considered real estate. In holding that the Legislature could not constitutionally exempt such fixtures from taxation, we recognized the difficulty inherent in granting the Legislature unbridled definitional powers:

Any definitional powers given to the Legislature are

prefixed and limited. The power to define household goods and personal effects necessarily is limited to those articles which ordinarily would be understood to be embraced within that term. Certainly, it cannot be interpreted to give the legislature power to include air-conditioning systems, furnaces, automobiles or real estate within the term "household goods and personal effects." Since there must be a limit to such powers, it is reasonable to find the common law concepts serve as guides.

*State ex rel. Meyer v. Peters, supra* at 334, 215 N.W.2d at 524.

Similarly, in *Moeller, McPherrin & Judd v. Smith, supra*, the Legislature attempted to tax various items of intangible personal property as tangible personal property merely by defining them as such. This court struck down the attempted redefinition, observing:

Section 77-104, Comp. St. 1929, which House Roll No. 9 purports to amend, provided that tangible property included all personal property possessing a physical existence, but excluding money, then defined intangible property as all other personal property, including money. Section 2 of House Roll No. 9 attempts to amend this by providing that tangible property shall consist of two classes, and that class 1 shall be all personal property possessing a physical existence, and then provides that class 2 of tangible property shall include stocks, notes, securities of foreign countries, accounts, judgments, liens of any kind, bonds, and all demands for labor, or other valuable thing, due or to become due. This introduces a new query, which is: May a legislature, under the guise of defining a word, do so with a definition which contravenes our Constitution, and which is not true or legal in fact? ...

Can the legislature define and designate as tangible that which is, in fact and in truth, intangible? It may be admitted that the Legislature has power to define words used by it, but is this an unlimited power, or is it subject to reasonable construction? . . . In our opinion, there is a limit to the legislature's power to nullify and circumvent

constitutional provisions by putting an arbitrary, but improper and unfounded, definition upon a certain word. *Moeller, McPherrin & Judd v. Smith, supra* at 432-33, 255 N.W. at 555-56.

Does the definition found in L.B. 1 tend to nullify or circumvent a provision of the Nebraska Constitution? I conclude that it does, in that Neb. Const. art. VIII, § 2, provides, "The Legislature may classify *personal property* in such manner as it sees fit, and may exempt any of such classes, or may exempt all personal property from taxation." (Emphasis supplied.) In this case, the Legislature has not "classified" certain items of personal property, but has arbitrarily declared the personal property owned by an unfavored group of taxpayers to be "fixtures," which are presumably taxable as real estate under our decision in *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989).

Here, the Legislature has attempted to define and designate as a "fixture" that which is, in fact and in truth, personal property, and has gone beyond the bounds of its legitimate powers in doing so.

I also conclude that the classification set forth in L.B. 1 is unconstitutional because it is not based on a real and substantial difference between "machinery and equipment used for business purposes or center pivot or other irrigation systems of a type used for agricultural or horticultural purposes" and machinery and equipment used for other purposes.

Neb. Const. art. III, § 18, provides that "where a general law can be made applicable, no special law shall be enacted." Under this provision, legislation is unconstitutional if it is arbitrary and unreasonable in method of classification or if the classification does not rationally promote the purpose of the legislation.

In *State ex rel. Douglas v. Marsh*, 207 Neb. 598, 608-09, 300 N.W.2d 181, 187 (1980), we held:

> While it is true that the Legislature may classify where reasonable . . . it may not do so in an arbitrary manner. In *City of Scottsbluff v. Tiemann,* [185 Neb. 256, 266, 175 N.W.2d 74, 81 (1970)], we specifically said: "It is competent for the Legislature to classify objects of

legislation and if the classification is reasonable and not arbitrary, it is a legitimate exercise of legislative power. [Citation omitted.] The classification must rest upon real differences in situation and circumstances surrounding members of the class relative to the subject of the legislation which renders appropriate its enactment. [Citations omitted.] The power of classification rests with the Legislature and cannot be interfered with by the courts unless it is clearly apparent that the Legislature has by artificial and baseless classification attempted to evade and violate provisions of the Constitution prohibiting local and special legislation. [Citation omitted.] A legislative classification, in order to be valid, must be based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified. *Classifications for the purpose of legislation must be real and not illusive; they cannot be based on distinctions without a substantial difference.* [Citations omitted.]" (Emphasis in original.)

See, also, *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 443 N.W.2d 566 (1989).

In L.B. 1, the classification of agricultural and business machinery is based solely on use. In *State ex rel. Meyer v. McNeil*, 185 Neb. 586, 177 N.W.2d 596 (1970), this court was presented with the question of whether agricultural income-producing machinery and equipment used by any business which was required by law to report taxable income pursuant to the Internal Revenue Code constituted a reasonable classification for purposes of taxation. In that case, the Legislature attempted to separately classify for taxation purposes certain agricultural income-producing machinery and equipment. This method would have provided a different value of personal property specified in the act from that applied to all other tangible property in the same class.

In *McNeil, supra*, we observed that the establishment of two methods of valuation of property in the same class for taxation purposes results in a want of uniformity, contrary to Neb.

Const. art. VIII, § 1. We held:

> We necessarily find that the purported classification of property for tax purposes contained in the act does not rest on reasons of public policy, or any substantial difference of situation or circumstance that naturally suggest the justice or expediency of diverse legislation with respect to the objects classified. It is therefore an attempt to create a classification within a classification without any reasonable grounds for so doing other than to secure advantages for those falling within the purview of the act. It is violative of the uniformity provisions of Article VIII, section 1, of the Nebraska Constitution. It is in effect special legislation in violation of Article III, section 18, of the Constitution.

*Id*. at 589-90, 177 N.W.2d at 599.

In the present case, "machinery and equipment used for business purposes or center pivot or other irrigation systems of a type used for agricultural or horticultural purposes" are tangible property which must be taxed uniformly as to both valuation and rate of tax. As we observed in *McNeil, supra* at 588-89, 177 N.W.2d at 598:

> There can be no difference in the method of determining valuation or the rate of tax to be imposed unless the separate classification rests on some reason of public policy, some substantial difference of situation or circumstance that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified.

I would hold that L.B. 1 is unconstitutional in its entirety.

FAHRNBRUCH, J., joins in this concurrence.

CAPORALE, J., concurring.

I agree with the result reached by the majority and therefore join in its judgment.

Although there may be much of merit in what Judge Grant has written about L.B. 1, I agree with the majority's conclusion that the enactment cannot be constitutionally applied for the 1989 tax year.

Once that determination is made, further examination

appears inappropriate. See *County of Hall ex rel. Tejral v. Antonson*, 231 Neb. 764, 437 N.W.2d 813 (1989) (courts refrain from passing on the constitutionality of legislation unless such determination is necessary for the proper disposition of the questions raised on appeal). Accord, *State ex rel. Labedz v. Beermann*, 229 Neb. 657, 428 N.W.2d 608 (1988); *State v. Radcliffe*, 228 Neb. 868, 424 N.W.2d 608 (1988); *Morse v. City of Omaha*, 67 Neb. 426, 93 N.W. 734 (1903).

L.B. 7 provides that for the 1989 tax year, the relevant section applies "to railroad rolling stock upon which no levy has been made or upon which no tax may lawfully be collected." As the majority's analysis of L.B. 1 demonstrates, the entire process for levying taxes on valuations established in 1989 had been fully completed by the time L.B. 7 was enacted. Consequently, L.B. 7, by its own terms, cannot apply to the issues presented for judicial determination in these cases.

Thus, again, while there may be merit in much of what the majority has declared with respect to L.B. 7, and perhaps too in much of what Judges White and Fahrnbruch have expressed in that regard, the above-cited rule of judicial self-restraint counsels against any present exploration of those issues.

SHANAHAN, J., concurring in part, and in part dissenting.

Although remanding these causes to the State Board of Equalization and Assessment is the correct result, cogent reasons for the remand, as such reasons appear to me, are quite different from the very suspect bases suggested elsewhere in this court's opinions in the present appeals.

For a centrally assessed taxpayer's appeal from a decision by the State Board of Equalization and Assessment, the standard of review was expressed in *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 808-09, 443 N.W.2d 249, 252 (1989): "[T]he standard of review will be to search only for errors appearing in the record; i.e., whether the decision conforms to law, is supported by competent and relevant evidence, and was not arbitrary, capricious, or unreasonable." When this standard of review is applied in the present appeals, the state board's decision must be reversed.

The constitutional requirement that Nebraska property taxes

be levied uniformly and proportionately, see Neb. Const. art. VIII, § 1, is a rule of uniformity which applies to both the rate of taxation and valuation of property for tax-raising purposes. *Gordman Properties Co. v. Board of Equal.*, 225 Neb. 169, 403 N.W.2d 366 (1987). "[T]he object of the law of uniformity is accomplished if all of the property within the taxing jurisdiction is assessed at a *uniform standard of value.*" (Emphasis in original.) *Carpenter v. State Board of Equalization & Assessment*, 178 Neb. 611, 619, 134 N.W.2d 272, 278 (1965).

Equalization of assessments has for its general purpose to bring the assessment of different parts of a taxing district to the same relative standard, so that no one of the parts may be compelled to pay a disproportionate part of the tax. *Hacker v. Howe*, 72 Neb. 385, 101 N.W. 255 (1904); *Gordman Properties Co. v. Board of Equal., supra.*

As a result of *Trailer Train Co. v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), issued on December 19, 1988, collection of the tax on personal property of Trailer Train, a centrally assessed car company-taxpayer in Nebraska, was permanently enjoined.

In the wake of *Trailer Train*, Natural Gas Pipeline Company (NGPL), as a centrally assessed "public service entity" within Neb. Rev. Stat. § 77-801 (Reissue 1990), requested that the state board equalize the value of NGPL's personal property for 1989. At the time of the August 15, 1989, hearing on NGPL's request, valuations for centrally assessed car companies and air transportation carriers were undetermined, but were expected to be determined in December 1989.

At the equalization hearing, the Nebraska Department of Revenue (DOR) informed the board that a "unit valuation method" was used to establish the value of personal property owned by railroads and public service companies, a "valuation of the entirety of a company, as opposed to a summation of individual parts of a company." Under the "unit valuation theory" or method, "particular assets . . . only develop value when there is an integrated use of [the] assets and the assets standing alone do not necessarily have an individual recognized value, [for example], a pipeline cut off at [a] county line would not necessarily have any value unless it's interconnected in a

complete unit." In applying the unit valuation method, DOR "allocates a portion of that total [unit] value . . . based on various factors, depending on [the] industry it is. These factors are intended to identify specific things about the companies that contribute to its value. Such as investment income, and other similar features." Although it is possible to determine a value for the various items of a centrally assessed taxpayer's personal property, that process "is extremely difficult, there's a lot of these types of property [that] do not carry value unless [they] are a part of the integrated unit." Nevertheless, according to DOR, through "unit valuation," personal property of railroad companies and public service entities is valued at "100 percent of market value." In reference to NGPL's equalization request, however, DOR used the 1989 "assessment sales ratio" for real estate in Nebraska's 93 counties, that is, the aggregate assessment sales ratio for residential and recreational acreages, commercial and industrial real estate, and agricultural land, which produced a factor of "91.91 percent," a weighted real estate average which was then applied to the value of NGPL's personal property. The board accepted the 91.91 real estate factor and set the 1989 equalization rate for NGPL's personal property at 91.91 percent.

As the result of the *Trailer Train* injunction, the state board faced a dilemma. If the value of NGPL's personal property were equalized with the value of other centrally assessed taxpayers' personal property, Trailer Train's personal property, which might have a value of "zero" for tax purposes as a result of the federal injunction, would become part of the equalization equation and perhaps necessitate a corresponding reduction in the tax value of NGPL's property, since the property of Trailer Train and NGPL apparently belong to the same general class. To avert that possibility, the State resorted to the 91.91 percent factor produced from the aggregate sales ratio of Nebraska real estate, although it was admittedly possible to achieve a value based on personal property of centrally assessed taxpayers—perhaps difficult, but, nevertheless, possible. Consequently, DOR resorted to real estate values to equalize the value of NGPL's personal property. In that process, DOR used values of real estate, nondepreciable

property with value ascertainable by different methods, in order to determine value for personal property, which is valued in relation to retail cost less depreciation. Thus, DOR's equalization method was not an attempt to compare apples with oranges, but an abortive attempt to establish a comparative similarity between oranges and orangutans. The absolute dissimilarity of property and essentially different values prevented an equalization under DOR's methodology. Were the adjustment of values made according to DOR's employed method, which was incorporated into the board's decision, there would truly be inequality in equalization. There is no factual basis for the board's equalization order; hence, the board's decision is arbitrary, unreasonable, and capricious and must be set aside.

In *Sommerfeld v. City of Seward*, 221 Neb. 76, 80, 375 N.W.2d 129, 132 (1985), we stated: "It has long been a rule in Nebraska that a court, including the Supreme Court, will decline to pass upon constitutionality of legislation unless such determination of constitutionality is necessary for proper disposition of an action." Therefore, if chronology has rendered the subject matter of L.B. 1 "irrelevant to equalization," as other members of this court believe, what is really irrelevant is any discussion about the constitutionality of L.B. 1, now Neb. Rev. Stat. §§ 77-103 and 77-103.01 (Reissue 1990). That same critique applies to this court's comments about L.B. 7.

However, since the court has proceeded to express certain views and conclusions regarding the legislation in question, some additional comment is in order lest silence give consent and tacit approval to the constitutionally unwarranted conclusions in other opinions expressed today. So, "Once more unto the breach, dear friends, once more."

This court has concluded that in the context of the present appeals, L.B. 1 is irrelevant and, in view of the chronology, could not be retroactively applied at the peril of offending the anticommutation of tax provision in Neb. Const. art. VIII, § 4. Yet, the fact is that L.B. 1 has never actually been applied to the appellants' claims for equalization, and, additionally, the state board's previous equalization order has been set aside, resulting

in proceedings anew before the state board. Thus, the equalization order and consequent equalization-ordered levies have vanished. There remains the unanswered question about what tax statutes apply when the board considers the appellants' applications on remand. The lapse of time would seem to have obviated concerns about the chronology inasmuch as the state board, as a result of these appeals, has yet to enter an order pursuant to the appellants' applications, and several events, including the enactment of L.B. 1, have transpired, or will have transpired, before the board considers the appellants' application on remand. An intriguing question arises concerning the law applicable to the prospective equalization proceedings, but that question, and perhaps an even more fascinating answer, must await another day which undoubtedly will come.

It is difficult to accept this court's conclusion that application of L.B. 1 to a 1989 equalization "would result in commutation of a tax, in violation of Neb. Const. art. VIII, § 4," especially when *Steinacher v. Swanson*, 131 Neb. 439, 268 N.W. 317 (1936), is offered as support for that conclusion. Decided in 1936, *Steinacher* dealt with legislation obviously intended to ease some of the burden from property tax liability during the Depression years, a time for many, it is safe to say, when money was not all that plentiful. The questioned legislation in *Steinacher* provided that property taxes, otherwise payable in a lump sum, could be paid in installments of 5 years for personal property and 10 years for real estate. According to the *Steinacher* court, that legislative transformation of a lump-sum payment into installment payments violated the anticommutation prohibition in Neb. Const. art. VIII, § 4, because "if the legislature has the power to extend the time in which taxes must be paid, as was done in the instant case, it could repeat the extensions or extend them for such a duration of time that it would amount to a remission of the tax." 131 Neb. at 448, 268 N.W. at 322. As a more accurate analysis of the *Steinacher* situation, the time value of a monetary lump-sum payment vis-a-vis installment payments results in the unconstitutional reduction of the amount due from the tax liability. In a consideration of L.B. 1 on its face,

that is, a facial challenge based on Neb. Const. art. VIII, § 4, which is exactly the nature of the question that others have unnecessarily undertaken to answer, just how application of L.B. 1 results in a reduction of any tax liability is unknown. To reach the "commutation" conclusion expressed today, much more information is required for the factual premises necessary as the bases for such conclusion, information which is understandably absent in view of the sequence of events leading to and during pendency of the present appeals.

In passing on L.B. 7, the court assails the Legislature's expressed objectives and considerations for enactment of the legislation. Legislative expressions of purpose, considerations, or reasons underlying enactment of L.B. 7 (Neb. Rev. Stat. § 77-202(11) (Reissue 1990)) appear in § 1 of that bill, whereas the provision for tax exemption of railroad rolling stock appears in § 2 of the bill. Those legislative expressions in § 1 may be characterized as a preamble for the actual exemption specified in § 2. A statutory preamble is a declaration or explanation of the reasons for enactment of the legislation and objectives sought to be obtained by the legislation. *Griffith v. New Mexico Public Service Commission*, 86 N.M. 113, 520 P.2d 269 (1974). While a statutory preamble may express legislative motives and inducements for enactment of legislation, the preamble is not an essential part of the legislation. *Portland Van & Storage Co. v. Hoss*, 139 Or. 434, 9 P.2d 122 (1932). Although language in a legislative enactment may provide a manifest indication of the objective to be achieved through the legislation, a court, with or without an expression of a legislatively avowed objective, has the duty to determine whether the Legislature has constitutionally exercised its power reasonably related to a valid governmental purpose or interest. See *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989). Therefore, apart from the legislatively expressed objectives, purposes, reasons, motives, or inducements pertaining to L.B. 7, the judicial determination is whether L.B. 7 is unconstitutional on account of the exemption for a railroad's rolling stock.

Neb. Const. art. VIII, § 2, in part provides that "[t]he Legislature may classify personal property in such manner as it

sees fit, and may exempt any of such classes, or may exempt all personal property from taxation." Generally, "the Legislature has plenary power over taxation except as limited by the Constitution." *State ex rel. Meyer v. McNeil*, 185 Neb. 586, 587-88, 177 N.W.2d 596, 598 (1970).

Tax classifications must be based on a real and substantial difference, having a reasonable relationship to the subject of the particular legislation. *Moeller, McPherrin & Judd v. Smith*, 127 Neb. 424, 255 N.W. 551 (1934). Tax classifications which do not rest on real differences of situation and circumstances violate the uniformity clause of the Nebraska Constitution. See *State ex rel. Meyer v. McNeil, supra*.

There is a real and substantial difference between railroad rolling stock, tax-exempt under L.B. 7, and property of other common carriers. Transportation of Nebraska products to market is essential to this state's economy. Among Nebraska's chief products is grain harvested in this state. It is self-evident that expeditiously getting Nebraska-harvested grain into the stream of interstate commerce, which frequently involves grain shipments to mills and ports at some distance from Nebraska, is vital to the strength of our state's economy. Large and usually rapid interstate shipments by rail are readily distinguishable from the relatively smaller quantities moved by motor carriers. I am unaware of any planeloads of grain moving by air carriers within or departing Nebraska. Therefore, although this court feels that mention of "restrictions or conditions" somehow constitutionally damns L.B. 7, the "conditions" might well apply to something as common as the weather, including inclemency, climatic conditions which the Postal Service considers in the expression "Neither snow, nor rain, nor heat, nor gloom of night stays these couriers from the swift completion of their appointed rounds." Then again, in retrospect, maybe comparing postal service to railroad operations is a bad example. However, all the sundry and imaginative interpretations regarding a legislative preamble for a statute are beside the point, since the preamble is not part of the tax exemption in L.B. 7 for railroad rolling stock. What is important is the classification by which railroad rolling stock is tax-exempt personal property. There is a reasonable and

legitimate basis for the exemption of railroad rolling stock under L.B. 7. For that reason, courts should decline to inquire into the wisdom, policy, or justness of valid legislative action. As we noted in *Spence v. Terry*, 215 Neb. 810, 816, 340 N.W.2d 884, 887 (1983): "Reasons underlying valid legislation are left first to the Legislature and ultimately to the electorate."

Turning to some of the court's comments in view of *Trailer Train v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), especially the statement "[E]ven if this state's present classification of property as exempt and not exempt was to be found valid under Nebraska's constitution, it could not withstand muster under federal law," *Trailer Train* does not support such assertion, for the court in *Trailer Train* stated: "The purpose of § 306 of the 4-R Act is to prevent tax discrimination against railroads in any form whatsoever. . . . It does not encroach upon a state's right to tax its citizens as it sees fit, as long as that tax does not discriminate against railroads." 885 F.2d at 416-17. What *Trailer Train* does teach is that Nebraska's tax structure does not exist in some provincial and pristine environment or in a vacuum, hermetically sealed to the law of the land. As federal protection against a state's discriminatory taxation of property is extended to various entities, consequences of property tax exemptions under state law will have to receive the most careful attention lest exemptions result in imposition of a disproportionate share of the tax burden on federally protected entities and thereby prevent collection of a tax revenue from those protected entities. The bell some hear as a death knell is really the signal for round 2 in the tax fight after *Trailer Train*.

Also, some of this court criticizes *Stahmer v. State*, 192 Neb. 63, 218 N.W.2d 893 (1974), but as we recently noted in *Banner County v. State Bd. of Equal.*, 226 Neb. 236, 252, 411 N.W.2d 35, 45 (1987), the Nebraska "Constitution . . . must be read as a whole." The constitutional requirement of uniformity or equality in taxation extends only to those objects of taxation which the Legislature has determined to be property subject to the tax burden. *U.S. Cold Storage v. Detroit Assessors*, 349 Mich. 81, 84 N.W.2d 487 (1957). See, also, T. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (8th ed.

1927). As the court observed in *State v. Willingham*, 9 Wyo. 290, 294, 62 P. 797, 798 (1900):

> [T]he State may tax all, or it may select for taxation certain classes, and leave the others untaxed. Considerations of general policy determine what the selection shall be in such cases, and there is no restriction on the power of choice unless one is imposed by constitution. . . . [The constitutional requirement of uniformity in taxation] merely obliges the Legislature to impose an equal burden upon all those who find themselves in the same class. . . . To be uniform, taxation need not be universal.

Requisite deference to each constitutional provision concerning taxation and exemption of property will be no small task and will be one which both the Legislature and this court will encounter again.

Next, there is the view expressed by some of the court that

> the classification set forth in L.B. 1 is unconstitutional because it is not based on a real and substantial difference between "machinery and equipment used for business purposes or center pivot or other irrigation systems of a type used for agricultural or horticultural purposes" and machinery and equipment used for other purposes.

For tax purposes, property is either real estate or personal property. L.B. 1, now § 77-103 (Reissue 1990), amends the statutory definition of "real estate," formerly contained in § 77-103 (Reissue 1986), and expands the previous definition, so that the meaning of "real estate" now includes "pipelines, railroad track structures, electrical and telecommunication poles, towers, lines, and all items actually annexed to such property, and any interest pertaining to the real property or real estate." Also, for purposes of taxation, L.B. 1 supersedes the common-law test to determine whether an item is a fixture or personal property and thereby eliminates the test for a fixture which this court used in *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989). As a consequence of L.B. 1, an article's actual annexation to real estate is the test to determine whether the item is a fixture and, therefore, part of the real estate. When used on real estate, each of the items added in the expanded definition of "real estate" in

§ 77-103 (Reissue 1990) is rendered immobile and becomes stationary as the result of some physical connection to the real estate. For instance, a pipeline is usually buried in the ground which it crosses, while structures such as electrical and telecommunications poles and towers are immobile when part of the structure is buried in the earth to support the remaining part above ground or when such items are securely fastened to buried foundations for additional support.

In contrast with the stationary aspect of those items within the definition of "real estate" in L.B. 1, a "center pivot," as part of an irrigation system, is self-propelled and, therefore, mobile machinery which consists of a single pipe or arm connected by a swivel to a fixed anchor or pivot usually located in the center of a field to be irrigated. The swivel arm, as the radius from the pivot point, is elevated and supported by towers which move on wheels along a constant circumferential path around the pivot. Water passing from the well near the pivot point is sprayed by sprinkler nozzles located on the arm as it sweeps the field much in the manner of the hand of a clock. Thus, the center pivot may be disconnected from the pivot point at one irrigation site and moved to another site for irrigation. See, Irrigation 327 et seq. (C. Pair 5th ed. 1983); M. Kay, Sprinkler Irrigation, Equipment and Practice 85 et seq. (Batsford Academic & Educational Ltd. 1983); II Academic American Encyclopedia 281 et seq. (1986). Irrigation systems used for agricultural and horticultural purposes may also consist of movable surface pipes as conduits for water sprayed from sprinklers attached to the pipes, thereby allowing mobility from one irrigation site to another. Therefore, mobility of a center pivot and other surface irrigation system distinguishes the foregoing property from those items which the Legislature has defined as "real estate" in L.B. 1.

Since it is extremely unlikely that there are mobile microwave towers or portable pipelines, in substance and effect, the Legislature has, by express definition, defined and classified some property as "real property" for taxation controlled by Neb. Const. art. VIII, § 1, and has, by specifically excluding certain types of property from "real estate," correspondingly defined and classified particular items as personal property for

the purposes of taxation controlled by Neb. Const. art. VIII, § 2, and Neb. Rev. Stat. §§ 77-201 et seq. (Reissue 1990). Therefore, the definition of "real estate" in L.B. 1 and the exclusion of certain property from statutorily defined "real estate," namely, a center pivot or other irrigation system of a type used for agricultural or horticultural purposes, have a rational basis and are, therefore, reasonable and not arbitrary or unfounded.

Even if this court had concluded that the business "machinery and equipment" provision of L.B. 1 was unconstitutional, that provision is distinct from "center pivot or other irrigation systems of a type used for agricultural or horticultural purposes" and is clearly severable pursuant to the express severability provision in L.B. 1, § 4. See, *State v. Monastero*, 228 Neb. 818, 424 N.W.2d 837 (1988); *Ewing v. Scotts Bluff Cty. Bd. of Equal.*, 227 Neb. 798, 420 N.W.2d 685 (1988); *State ex rel. Douglas v. Sporhase*, 213 Neb. 484, 329 N.W.2d 855 (1983).

In any event, these causes are remanded for proceedings before the State Board of Equalization and Assessment. With that disposition, I concur.